UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
TAARIQ STEPHENS,

                Petitioner,

    -against-

DONITA MCINTOSH,

                Respondent.

----------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
22-cv-03313 (CBA)

**AMON, United States District Judge:**

Taariq Stephens challenges his manslaughter conviction pursuant to 28 U.S.C. § 2254. (ECF Docket Enty ("D.E.") # 1.)  He raises seven grounds for habeas relief:  (1) the trial court failed to instruct on second-degree manslaughter as a lesser included offense of murder; (2) the trial court improperly admitted unauthenticated video recordings allegedly depicting him committing the shooting; (3) the trial court improperly admitted hearsay statements identifying him as the killer; (4) his consecutive sentence was improper, unduly harsh, and excessive; (5) he is factually innocent; (6) there was prosecutorial misconduct; and (7) his trial counsel rendered ineffective assistance.  (D.E. # 9 ("Am. Pet.") 11-14.)[1]  For the reasons set forth below, Stephens's petition seeking a writ of habeas corpus is DENIED.

## BACKGROUND

### I.    The Killing and the State Trial Proceedings

Following a jury trial in New York Supreme Court, Kings County, Stephens was convicted of first-degree manslaughter, second-degree criminal possession of a weapon, and endangering the welfare of a child in connection with the May 31, 2016 shooting of 16-year-old Shemel Mercurius. (Id. 2-3.)  At trial, the government offered the evidence that Mercurius met Stephens a "few weeks"

---

[1] I stayed his petition to allow him to exhaust certain claims under Rhines v. Weber, 544 U.S. 269 (2005).  (Text Order dated Dec. 16, 2022.)

1

prior to the shooting.  (D.E. # 13 Ex. B ("Tr.") 287.)[2]  In the days leading up to Mercurius's death, she messaged and called two numbers labeled "Akeem" and "Angel," as well as one labeled "Taariq."  (Am. Pet. 9; Tr. 128-30.)  On the day before the shooting the messages and calls between Mercurius and "Taariq" became more frequent, and there was some discussion of a relationship between them.  (Tr. 130-32.)  Around 5:15 PM on May 31, Mercurius and her best friend Louna Julien picked up Mercurius's nephew from day care to take the child to her aunt's apartment at 1406 Brooklyn Ave.  (Id. 198, 201; Am. Pet. 5.)  Julien left the apartment building to pick up homework that she wanted Mercurius's help with.  (Am. Pet. 5.)

Ten minutes later, Julien returned to the apartment.  As she exited the elevator, she saw a man push Mercurius by the neck and tell her to "mind [her] business" and "don't ever lie to me." (Tr. 208-09; Am. Pet. 5.)  While Mercurius was screaming, the man shot her and fled using the stairs.  (Tr. 210; Am. Pet. 5.)  Following 911 calls, four NYPD officers arrived to find Mercurius heavily bleeding, going in and out of consciousness.  (Am. Pet. 5-6; Tr. 267-69.)  The officers removed the three-year-old child and secured the apartment before questioning Mercurius about her identity and that of her shooter.  (Am. Pet. 6.)  She named "Taariq" as the assailant, and provided information about his age, appearance, address, how she met him, and their relationship. (Id.)  The officers rendered first aid while waiting for EMS to arrive; she was taken to the hospital where she died of gunshot wounds from a single bullet.  (Id.)

On June 1, 2016, NYPD officers extracted the phone number labeled "Taariq" from Mercurius's phone and identified the subscriber as Stephens's grandmother.  (Id. 7.)  Police searched for Stephens at his grandmother's address (the same address Mercurius had given for Stephens) but did not find him.  (Id.)  The next day, Stephens surrendered at the precinct.  (Id.)

---

[2] Respondent filed as Exhibits A and B to its Opposition the transcript of a suppression hearing and Stephens's trial respectively.  For convenience, Exhibit A will be referred to as "H. Tr." and Exhibit B as "Tr."

After Stephens was in custody, the police continued to gather identification evidence. Julien identified Stephens in a photo array and in a lineup as the man she saw shoot Mercurius. (Id.; Tr. 6-11.)  At trial, Julien and Detective Balboni (who organized the line up) recalled the circumstances surrounding the lineup identification differently.  Julien testified that Detective Balboni said that the fifth person, Stephens, was the one who shot Mercurius; Detective Balboni testified that Julien volunteered that the fifth person shot Mercurius.  (Tr. 212-13, 338-39.)  Julien also identified Stephens at trial after some emotional distress.  (Id. 205, 211-13.)

The NYPD gathered video evidence from multiple cameras installed by the apartment building's owner.  (Am. Pet. 7.)  Over Stephens's objection, the trial court allowed the videos into evidence as sufficiently authenticated although the custodian had not compared the video downloaded on the USB drive entered into evidence to the originals from the apartment building's system.  (Tr. 96-98.)  Still images from the video were also entered into evidence, to which Stephens did not object.  (Id. 99.)  Other evidence the State presented to the jury included: ballistics evidence about the bullets found at the scene and their match to the gun seen in the video; logs of texts and phone calls to and from Mercurius's cell phone; and testimony about Mercurius's death.  (Am. Pet. 5-9.)

At the charging conference, Stephens requested charges for first and second-degree manslaughter as lesser included offenses of second-degree murder.  (Id. 10.)  The court partially denied the request because no "reasonable view of the evidence [] would permit" a second-degree manslaughter charge, and instructed the jury on second-degree murder, first-degree manslaughter, second-degree criminal possession of a weapon, and reckless endangerment of a child.  (Id. (quoting Tr. 456).)  After three days of deliberations, the jury acquitted Stephens of the second-degree murder charge, but found him guilty of the remaining three charges.  (Id.)  The court

sentenced Stephens to a total of 40 years' imprisonment: 25 years for the manslaughter charge followed by a consecutive 15-year term for the weapon possession charge and a concurrent one-year term for the reckless endangerment charge. (Id. 10-11.) Each of these terms represented the statutory maximum. (Id. 11.)

## II. Appellate and Post-Conviction Proceedings

### A. Appeal

On direct appeal, Stephens argued five grounds for reversal. (D.E. # 14 Ex. C ("App. Br.") i.[3]) First, he argued that the trial court should have instructed the jury on second-degree manslaughter because there was a reasonable view of the evidence that Stephens had recklessly—rather than with intent to cause serious physical injury—killed Mercurius. (Id. 16.) He theorized that the jury may have split the difference and found first-degree manslaughter in the absence of a homicide charge with a recklessness mens rea requirement. (Id. 22-23.) Second, he argued that the admission of the improperly authenticated surveillance video denied him a fair trial, given the "relative ease of altering such evidence without leaving evidence of tampering." (Id. 23-28.) Third, he argued that the admission of Mercurius's identification of him violated his rights under the Confrontation Clause because the primary purpose of the interaction between the police and Mercurius was with an eye to prosecuting Stephens. (Id. 33-34.) Fourth, he challenged the court's imposition of consecutive sentences as violating New York criminal procedural law and excessive under the Eighth Amendment. (Id. 35-38.)

The Appellate Division, Second Department, rejected each of Stephens's arguments on appeal. People v. Stephens, 189 A.D.3d 1270 (2020). The Appellate Division affirmed the jury

---

[3] Similarly to the other state trial records, see supra n. 2, the appellate papers are filed as single PDFs in two separate docket entries (D.E. ## 14-15) with multiple exhibits in each docket entry. For ease of reference, I will refer to each exhibit by internal page numbers unless stated otherwise.

instruction because "there is no reasonable view of the evidence that would support a finding that the defendant acted recklessly when he shot the victim," even "[v]iewing the evidence in the light most favorable to the defendant." Id. at 1271. It held that the State adequately authenticated the surveillance video, and that since the primary purpose of Mercurius's identification was "to address an ongoing emergency," it was not a testimonial statement subject to the Confrontation Clause. Id. Finally, the Appellate Division upheld the consecutive sentence as procedurally proper and found the 40-year sentence not excessive. Id.[4]

**B. Section 440 Petition**

Stephens next moved to vacate his conviction under NY CPL § 440.10. (D.E. # 14 Ex. G ("440 Br.").[5]) He raised three new grounds for relief: prosecutorial misconduct, actual innocence, and ineffective assistance of counsel. (Id. 1804.) Stephens alleged that the State had committed prosecutorial misconduct by knowingly presenting Julien's false identification of Stephens. (Id. 1804-05.) To support this claim, he cited the shakiness of Julien's in-trial and pre-trial testimony as well as the affidavit of his friend Keston Pile, who reported that Julien later recanted her trial testimony. (Id. 1804-05, 1820-23.) Next, Stephens claimed that he did not receive adequate assistance of counsel because of, among other things, deficiencies in his counsel's interrogation of Julien and pre-trial management of the case. (Id. 1804-06, 1823-29.) Lastly, he maintained his assertion of actual innocence, supported by Pile's affidavit and one of his own. (Id. 1817-20.)

The New York Supreme Court, Kings County, denied Stephens's motion to vacate. (D.E. # 15 Ex. J ("Sup. Ct. 440").) The court rejected each of Stephens's arguments. It rejected the prosecutorial misconduct claim because there was "no credible evidence whatsoever that the prosecutor covertly directed Julien to make an in-court identification of" Stephens. (Id. 9-10.)

---

[4] Stephens petitioned for leave to appeal to the New York Court of Appeals, which was denied. 36 N.Y.3d 1100.
[5] For this unpaginated brief, I refer to PageID numbers.

Second, it rejected the actual innocence claim because Pile's vague affidavit suggesting that Julien retracted her trial testimony was "inherently suspect and unreliable," and Stephens's affidavit was unsupported by other evidence.  (Id. 9.)

Finally, the court rejected Stephens's ineffective assistance claim because "the trial record demonstrates that counsel effectively pursued a reasonable strategy based on arguing vigorously that the statements made by Mercurius, and Julien's identification were not reliable evidence that defendant was the shooter, while also contending that proof of intent to cause death fell short of what was needed for a murder conviction."  (Id. 11-12; see also id. 13-14 (documenting counsel's pre-trial efforts).)  And this trial strategy was in part successful, as the jury acquitted Stephens of the second-degree murder charge.  (Id. 12.)[6]

## STANDARD OF REVIEW

A federal court may grant habeas relief to a state prisoner only for violations of federal law. 28 U.S.C. § 2254(a).  A federal court may deny relief on the merits, but ordinarily may not grant habeas relief, to claims that were unexhausted in state court.  Id. §§ 2254(b)(1)(A), (b)(2).  When the state courts have reviewed a petitioner's claims on the merits, "a federal court shall grant the writ only if the relevant state court decision (1) was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Musaid v. Kirkpatrick, 114 F.4th 90, 107 (2d Cir. 2024) (quoting 28 U.S.C. § 2254(d)).  This standard is "difficult to meet."  Harrington v. Richter, 562 U.S. 86, 102 (2011).  "A state court's determination that a claim lacks merit precludes federal

---

[6] Both the Appellate Division and the Court of Appeals denied Stephens leave to appeal the Supreme Court's motion to vacate decision.  (D.E. # 15 Exs. M & P.)

habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Id. at 101 (internal quotation marks and citation omitted).

## DISCUSSION

I now address each of his claims in turn.

### I.    Failure to Instruct on a Lesser Included Offense

Stephens's first claim is that the trial court's alleged failure to instruct the jury on second-degree manslaughter violated his due process rights because a reasonable view of the evidence could have led the jury to convict him of second-degree, rather than first-degree, manslaughter. (D.E. # 9-1 ("Pet. Mem.") 8-11.) The Appellate Division rejected this claim because "there is no reasonable view of the evidence that would support a finding that the defendant acted recklessly when he shot the victim." Stephens, 189 A.D.3d at 1271. He argues this decision is contrary to the United States Supreme Court's decision in Beck v. Alabama, which held that Alabama's procedural rule to categorically bar a lesser-included offense instruction solely to capital counts violated due process when there was "some doubt with respect to an element" of the capital offense. 447 U.S. 625, 637 (1980).

Stephens's argument fails for at least two reasons. First, Beck does not apply to non-capital cases on habeas review. Jones v. Hoffman, 86 F.3d 46, 48 (2d Cir. 1996) (distinguishing the portion of United States v. Zapata-Tamalo, 833 F.3d 25 (2d Cir. 1987), on which Stephens relies as dicta and barred by Teague v. Lane, 489 U.S. 288 (1989)). Because Stephens's failure-to-instruct claim is not premised on any clearly established federal law, habeas relief cannot lie. E.g., Desjardins v. Recette, No. 15-cv-526 (RJD), 2021 WL 3634775, at *6 (E.D.N.Y. Aug. 17, 2021) ("[D]istrict courts in the Second Circuit regularly hold that habeas review of a state trial court's failure to charge the jury on lesser-included offenses in noncapital cases is precluded").

Second, even if <u>Beck</u> were to extend to non-capital cases, it would not demand a lesser-included offense instruction where there is no reasonable view of the facts that would justify that instruction. <u>Hopper v. Evans</u>, 456 U.S. 605, 611-12 (1982). Applying the mandatory deference owed to state courts on questions of fact in light of the evidence at trial, <u>see</u> 28 U.S.C. §§ 2254(d)(2), 2254(e)(1), the state courts did not clearly err in finding that the evidence did not support a lesser-included instruction of second-degree (reckless) manslaughter rather than first-degree manslaughter. The evidence at trial showed that Stephens shoved Mercurius down and screamed at her, shot her with his gun, and that a bullet from the gun killed her. It strains credulity that Stephens did not want to cause "serious physical injury," NY CPL § 125.20(1), given that he shot Mercurius at point-blank range. New York courts have recognized that when there is no evidence that a "defendant accidently discharged his weapon" and "the evidence shows that [the defendant] shot [the victim] at very close range, from mere inches to a couple feet away," the only inference is that the defendant intended to cause serious physical injury. <u>People v. Lora</u>, 85 A.D.3d 487, 492 (1st Dep't 2011) (reversing trial court's instruction of second-degree manslaughter in such a case). The state courts here correctly applied New York law in denying Stephens a second-degree manslaughter charge. <u>See</u> <u>Bonilla v. Lee</u>, 35 F. Supp. 3d 551, 570-71 (S.D.N.Y. 2014) (denying a <u>Beck</u> claim when no reasonable view of the evidence would have supported a first-degree manslaughter charge rather than a second-degree murder charge).[7]

---

[7] Third, even applying <u>Beck</u>, the Constitution was likely not violated because Stephens was also charged on other serious offenses. <u>See</u> <u>Schad v. Arizona</u>, 501 U.S. 624, 647 (1991) (the "central concern of <u>Beck</u>" was not implicated when the "jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence"); <u>see also</u> <u>Terry v. Petsock</u>, 974 F.2d 372, 378-79 (3d Cir. 1992) (Alito, J.) (<u>Beck</u> is not violated when the jury is also instructed on "several serious noncapital offenses").

II.    **Admission of the Unauthenticated Video**

Stephens next argues that the admission of the surveillance video—which he says was unauthenticated since the detective did not ensure the downloaded version was identical to the original—was such an egregious error that he was denied a fundamentally fair trial.  (Pet. Mem. 12.)  He argues that because "identity was hotly contested at trial" and the surveillance video was "[c]ritical to this determination," the admission of a misleading video unfairly swayed the trial against him.  (Id. 13.)

As Stephens acknowledges (id. 12), "a state court's evidentiary rulings, even if erroneous under state law, do not present constitutional issues cognizable under federal habeas review . . . unless the challenged evidentiary rulings in the state proceedings affect the fundamental fairness of those proceedings."  McKinnon v. Superintendent, Greater Meadow Corr. Fac., 422 F. App'x 69, 72-73 (2d Cir. 2011).  The ruling may affect the fundamental fairness if the evidence, viewed in light of the entire record, "was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it."  Id. (quoting Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985)).

As an initial matter, the Appellate Division held the admission of the video was not erroneous "as the People presented sufficient evidence that the video and still images accurately represented the events being depicted."  Stephens, 189 A.D.3d at 1271.  New York courts allow videos to be authenticated by the downloader, e.g., People v. Harris, 199 A.D.3d 497, 498 (1st Dep't 2021), or by other circumstantial evidence present here, e.g., Matter of Mekayla S., 229 A.D.3d 1040, 1041-43 (4th Dep't 2024).  In the absence of even an evidentiary error, Stephens's second claim does not warrant habeas relief.

Even assuming an evidentiary error, there was other sufficient evidence to convict Stephens of killing Mercurius. Julien, an eyewitness, testified at trial that Stephens was the killer. Mercurius told officers that Stephens killed her, and the still images—which Stephens does not challenge—also show him temporally and physically near the killing. Thus, any assumed error in allowing in the surveillance video was not so pervasive as to deprive Stephens of a fundamentally fair trial. McKinnon, 422 F. App'x at 73 (listing alternative evidence to deny habeas for an assumed evidentiary error). As such, Stephens's second claim for habeas relief is denied.

## III.    Mercurius's Hearsay Statements

Stephens next argues that the trial court's admission of Mercurius's dying identification of him as her killer through police testimony violated his Sixth Amendment right to confront adverse testimonial witnesses under Crawford v. Washington, 541 U.S. 36 (2004) and its progeny. (Pet. Mem. 14.)[8] "The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him. The Clause bars the admission at trial of 'testimonial statements' of an absent witness unless she is 'unavailable to testify, and the defendant ha[s] had a prior opportunity' to cross-examine her." Smith v. Arizona, 602 U.S. 779, 783 (2024) (quoting Crawford, 541 U.S. at 53-54). "Testimonial" statements include those that were "made in the course of police interrogation when the primary purpose of the interrogation was to establish or prove past events potentially relevant to later criminal prosecution," but not those "made to police to meet an ongoing emergency that were not procured with a primary purpose of creating an out-of-court substitute for trial testimony." United States v. Johnson, 117 F.4th 28, 48 (2d Cir. 2024) (cleaned up). "To determine whether the 'primary purpose' of an interrogation is 'to enable police to meet an ongoing emergency,'" or for testimonial ends, courts "objectively evaluate the

---

[8] Stephens does not argue that the admission of Mercurius's statement violated his constitutional rights because of an erroneous application of a hearsay exception. (See Pet. Mem. 14-15.)

circumstances in which the encounter occurs and the statements and actions of the parties."
Michigan v. Bryant, 562 U.S. 344, 359 (2011) (quoting Davis v. Washington, 547 U.S. 813, 822
(2006)).

Stephens argues that the NYPD officers' questions betray a prosecutorial primary purpose
in their conversation with Mercurius: their questions about the perpetrator's identity were not
"relevant to rendering emergency resuscitative aid," and their questions about the perpetrator's
motive (Stephens's relationship with Mercurius) show no concern for additional violence because
"the victim had already been shot." (Pet. Mem. 15.) According to Stephens, this shows that the
"officers' purpose in interrogating the victim was not to meet an ongoing emergency, but instead
to establish past events potentially relevant to later criminal prosecution." (Id.)

Stephens fails to show that the Appellate Division's decision that "the primary purpose in
questioning the victim was to address an ongoing emergency[] and the victim's statements were
not testimonial in nature" was a misapplication of controlling Supreme Court precedent. Stephens,
189 A.D.3d at 1271. When the police arrived, they found Mercurius bleeding on the floor from a
gunshot wound. The atmosphere was fluid with different officers arriving separately and some
rendering first aid. They did not know who or where the shooter was, so asked Mercurius questions
about what happened and who had shot her. At the officers' request, Mercurius identified the
identity, location, and characteristics of the shooter, who was assumed armed and dangerous.
Mercurius also volunteered that she thought Stephens wanted to be in a relationship with her, but
she did not want to be in a relationship with him. (Tr. 236-37, 287-89.) The fluidity and
informality of the situation, as well as the leads Mercurius provided to assist in locating Stephens,
who was still at large, support the Appellate Division's decision that the officers and Mercurius

11

were principally concerned with locating Stephens and stopping the threat he posed, rather than with developing a substitute for Mercurius's trial testimony against him.

As Respondent notes, the Supreme Court's on point holding in <u>Bryant</u> confirms this conclusion. <u>See</u> <u>Bryant</u>, 562 U.S. at 348, 377 (when police found the victim shot at a gas station and the situation was "fluid and somewhat confused" with "officers arriv[ing] at different times" and asking questions about "what had happened[ and] who had shot him . . . the interrogators' primary purpose was simply to address what they perceived to be an ongoing emergency, and the circumstances lacked any formality that would have . . . focused [the victim] on the possible future prosecutorial use of his statements."). Accordingly, Stephens's Confrontation Clause claim fails.

## IV.    Excessive Sentence Claim

Stephens further claims that habeas relief is warranted because his consecutive sentences totaling forty years are grossly disproportionate to the gravity of the offenses and so violates the Eighth Amendment. (Pet. Mem. 16-18.) This argument fails because the sentences were within the statutory range (<u>see</u> D.E. # 12 ("Opp'n") 1019-20[9]) and "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992); <u>see</u> <u>Viera v. Sheahan</u>, No. 16-cv-4048 (KAM), 2020 WL 3577390, at *12-13 (E.D.N.Y. June 30, 2020) (denying excessive sentence claim for forty-two years of imprisonment for first time offender who at nineteen years old committed first-degree manslaughter, second-degree criminal possession of a weapon, and third-degree bribery).

Stephens's analogy (Pet. Mem. 17) to <u>Miller v. Alabama</u>, 567 U.S. 460 (2012), which prohibited mandatory life sentences without parole for juvenile offenders, is inapposite because Stephens was not a minor and did not receive a de facto or de jure life sentence. <u>United States v.</u>

---

[9] Because the Respondent's Opposition's internal pagination repeats, I will refer to the PageID number.

Sierra, 933 F.3d 95, 97 (2d Cir. 2019) (mandatory life sentence for those between eighteen and twenty-two years old does not violate Miller); United States v. Portillo, 981 F.3d 181, 184 (2d Cir. 2020) (upholding a fifty-five-year sentence for a defendant who was involved in murders at age fifteen).

## V.    Actual Innocence

Stephens next argues that habeas should be granted because he is actually innocent. (Pet. Mem. 18-19.)  His argument proceeds in three steps:  first, the United States Supreme Court "assumed, without deciding, that execution of an innocent person would violate the Constitution," and that this should allow him to present pre-existing and newly discovered evidence. (Id. (citing Herrera v. Collins, 506 U.S. 390 (1993)).)  Next, the DNA evidence presented at trial was weak and Julien's identification was unreliable. (Id. 20.)  Third, Stephens presents a friend's affidavit claiming that Julien later retracted her trial testimony. (Id. 20-21.)  He argues that this claimed retraction, together with his statement that he had an alibi, should provide grounds for habeas or at least an evidentiary hearing.

As an initial matter, Stephens does not acknowledge that "[t]o this day, whether a federal right based on a claim of actual innocence exists is an open question."  Jimenez v. Stanford, 96 F.4th 164, 183 (2d Cir. 2024) (cleaned up).  The claim hypothesized in Herrera was an actual innocence claim based on newly discovered evidence, not evidence presented at trial.  Herrera, 506 U.S. at 405.  Actual innocence based on evidence presented at trial is subject to the standards laid out in Jackson v. Virginia, 443 U.S. 307 (1979) and AEDPA.  Smith v. Nagy, 962 F.3d 192, 205 (6th Cir. 2020).  Under that standard, a reviewing court determines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt."  Jackson, 443 U.S. at 319.

I must defer to the jury's determinations of the weight of the evidence, credibility of witnesses, and what inferences to draw from the evidence. United States v. Morrison, 153 F.3d 34, 39 (2d Cir. 1998). And because the state court adjudicated this claim on the merits, I must defer to its reasonable application of the Jackson standard. Smith, 962 F.3d at 205; 28 U.S.C. § 2254(d)(1).

Here, the New York Supreme Court found that the jury was "well aware of the inconsistencies and limitations of Julien's testimony," and may have "concluded that Balboni's testimony was more credible, or they determined that there was sufficient proof of the defendant's guilt aside from Julien's testimony, or both." (Sup. Ct. 440 at 10.) The Supreme Court went on to list the other evidence that supported identification of Stephens, including the match of the video evidence to his appearance, his texts with Mercurius, and Mercurius's identification of Stephens as supporting the jury's verdict. (Id. 10-11.) Given this evidence, I agree that a rational jury could have relied on Mercurius's identification of Stephens as well as the other corroborating evidence to convict Stephens without needing to rely on Julien's testimony. Even the testimony of a single, uncorroborated eyewitness is enough to support a conviction, e.g., Murray v. New York, No. 15-cv-3555 (JFB), 2017 WL 3704677, at *12 (E.D.N.Y. Aug. 28, 2017) (collecting cases), and all the more so here when the evidence corroborated Mercurius's identification of her assailant. Therefore, any doubts cast on Julien's identification do not warrant habeas relief.

Stephens's purported newly discovered evidence includes the affidavit of a friend, Keston Pile. Pile "claims without further explanation or detail that 'a while after Mr. Stephens' trial was over,' Julien told him that [D]efendant was not the shooter and that first the police, and then the prosecutor, had directed her to pick [D]efendant out and say that he was the one who had done it." (Sup. Ct. 440 at 8.) Stephens also provided his own affidavit explaining that he was at his grandmother's house at the time of the shooting. (Id.) Even assuming a freestanding claim of

14

actual innocence is cognizable, the Supreme Court "announced that the burden of proof for a 'threshold showing' of such a right 'would necessarily be extraordinarily high.'" Jimenez, 96 F.4th at 183 (quoting Herrera, 506 U.S. at 417).  The new evidence must be reliable and sufficiently convincing that it is "more likely than not" that "any reasonable juror would have reasonable doubt."  Rivas v. Fischer, 687 F.3d 514, 541 (2d Cir. 2012) (citing House v. Bell, 547 U.S. 518, 538 (2006)).  Neither Stephens's nor Pile's affidavits meet this high bar.

As the New York Supreme Court found, the Pile affidavit "appear[s] calculatedly vague and uninformative" and, in either case, "recantation of trial testimony is inherently suspect and unreliable."  (Sup. Ct. 440 at 9.)  The court rejected Stephens's affidavit because it was "not supported with an affidavit from his grandmother or anyone other than himself," as required under New York law.  (Id. 11); see also NY CPL § 440.30(4)(d)(i).  Moreover, the Supreme Court held that the introduction of either affidavit would have been unlikely to have changed the verdict. Stephens's counsel repeatedly attacked the reliability of Julien's testimony, so an additional piece of evidence seeking to undermine it would have been merely cumulative.  Therefore, even if an actual innocence claim were available, Stephens's proffered evidence woefully fails to establish it.

## VI.    Prosecutorial Misconduct

Stephens next claims that habeas relief is warranted because he claims the State knowingly elicited Julien's false identification at trial.  (Pet. Mot. 21-24 (citing, inter alia, Napue v. Illinois, 360 U.S. 264 (1959)).)  Stephens cites four pieces of evidence in support of this claim:  (1) Julien's initial testimony that she only identified Stephens in the lineup after an officer directed her to do so; (2) a pre-trial notice the State provided Stephens which advised him that Julien retracted a pre-trial letter in which she identified Stephens as Mercurius's assailant and explained that Stephens was upset that Mercurius would not have sex with him; (3) that at trial Julien needed a recess in

order to identify Stephens; and (4) Pile's affidavit claiming that Julien subsequently retracted her trial testimony.  (Id. 23-24.)  The New York Supreme Court rejected Stephens's prosecutorial misconduct claim as unsupported by any non-speculative evidence.  (Sup. Ct. 440 at 9-10.[10])

"To challenge a conviction on the basis of a prosecutor's knowing use of false testimony, the defendant must demonstrate that there was false testimony, that the prosecutor knew or should have known it was false, and that there was a reasonable likelihood that the false testimony could have affected the jury's judgment."  United States v. Conners, 816 F. App'x 515, 519-20 (2d Cir. 2020) (citing United States v. Helmsley, 985 F.2d 1202, 1205-06 (2d Cir. 1993)).  When inconsistencies in testimony "are revealed on cross-examination, it is for the jury to determine credibility."  Id. at 520 (citing United States v. Josephberg, 562 F.3d 478, 494 (2d Cir. 2009)).

Stephens has not shown that the state courts' application of the rule set out in Conners was an unreasonable application of controlling federal law.  First, Stephens has not shown that Julien's trial testimony was in fact false.  Indeed, she repeatedly identified Stephens as the killer after seeing him at close range.  (Sup. Ct. 440 at 8-9.)  Her two supposed retractions—one of a pre-trial letter and one reported in Pile's affidavit—are vague and unconvincing.  Given the amount of evidence against Stephens in this case, I cannot find that he has shown Julien's testimony to be false.  Since Stephens has not shown the testimony itself was false, he cannot show that the prosecutor knew or should have known that it was false.  The State was not obliged to credit Julien's pre-trial retraction of a letter or her account of the circumstances of the line up, particularly when the State had ample additional evidence.  And because the Supreme Court found that the jury

---

[10] The Supreme Court held that the prosecutorial misconduct claim as it relates to alleged police misconduct during the lineup was procedurally barred.  (Sup. Ct. 440 at 9.)  Respondent does not rely on this procedural bar as to that evidence and may have waived that defense.  See United States v. Weinlein, 109 F.4th 91, 105 (2d Cir. 2024) (Menashi, J., concurring); see Day v. McDonough, 547 U.S. 198, 206-07 (2006).  While I may raise the issue of procedural default sua sponte, Washington v. James, 996 F.2d 1442, 1448 (2d Cir. 1993), I need not do so here where Stephens's claim fails on the merits, even under de novo review as to the argument about alleged police misconduct, see Fulton v. Graham, 802 F.3d 257, 263-65 (2d Cir. 2015).

was well aware of the limitations of Julien's testimony, it was within its rights to conclude that it was unlikely Stephens's new evidence would have affected the jury's judgment. As such, Stephens has not shown that the state courts unreasonably applied federal law in rejecting his prosecutorial misconduct claim. Garbutt v. Conway, No. 5-cv-9898 (SHS), 2008 WL 3842967, at *12 (S.D.N.Y. Aug. 15, 2008).

**VII.    Ineffective Assistance of Trial Counsel**

Stephens's last argument is that he was denied a fair trial because his trial counsel rendered ineffective assistance. (Pet. Mot. 25-31.) He identifies several ways in which he claims his trial counsel fell below the standard of reasonableness set in Strickland v. Washington, 466 U.S. 668 (1984): (1) counsel "failed to diligently represent Petitioner during the grand jury proceedings by failing to challenge Petitioner's indictment" despite issues in Julien's testimony; (2) counsel "did not argue that prosecution failed to show good cause as to why Petitioner should not be released on his own recognizance" pending trial; (3) "counsel failed to adequately consult with Petitioner prior to trial or to provide him with discovery"; (4) counsel "failed to prepare prewritten questions in advance of trial"; (5) counsel "failed to object to incorrect statements of the prosecutor"; (6) counsel failed to "interview Julien or have a private investigator do so" before trial; (7) "counsel failed to request a Wade hearing with respect to Julien's purported eyewitness identification"; (8) counsel "[in]effectively cross-examined Julien about her [pretrial] letter"; (9) counsel failed to investigate Stephens's purported alibi; and (10) counsel failed to investigate the possibility of an alternate perpetrator defense. (Pet. Mot. 25-31.) The Supreme Court rejected Stephens's ineffective assistance of trial counsel claim, considering the trial record as well as affidavits from Stephens, Pile, and Stephens's trial counsel Jay Cohen. (Sup. Ct. 440 at 11-14.) As such, AEDPA deference applies.

17

To challenge a conviction as violating the Sixth Amendment's guarantee of effective counsel, a petitioner must "show both that (1) counsel's performance was objectively deficient, and that (2) petitioner was actually prejudiced as a result." Englert v. Lowerre, 115 F.4th 69, 81 (2d Cir. 2024) (quotation omitted). At the first step, I defer to counsel's judgment, recognizing his greater familiarity with the facts of the case, his client, and the proceedings. Richter, 562 U.S. at 105. And at both steps, I must give the New York courts further deference to have reasonably applied Strickland. Burt v. Titlow, 571 U.S. 12, 15 (2013). Therefore, in order to press ineffective assistance on habeas review, a petitioner must show that "every fairminded jurist would agree that every reasonable lawyer" would have conducted the case as petitioner claims his lawyer should have. Englert, 115 F.4th at 83 (quotation omitted). Stephens fails to meet this standard.

Several of Stephens's claims can be rejected out of hand. As the Supreme Court found, Stephens's claims regarding the participation in the grand jury proceedings and the Wade hearing (claims 1 and 7) are belied by the record which shows Mr. Cohen's participation in both. (Sup. Ct. 440 at 13.) Stephens's claim about Mr. Cohen's failure to request pretrial release (claim 2) is unavailing because I cannot remedy any pretrial detention error, and he does not allege any way in which his trial would have been different had he been released. See United States v. Etuk, No. 23-5011, 2023 WL 6060327, at *2 (10th Cir. Sept. 18, 2023) ("Etuk['s] claim[ that] his bond would not have been revoked but for his attorney's ineffective assistance at the bond-revocation hearing" was not cognizable on habeas because the statute "does not authorize any relief that would remedy Etuk's allegedly wrongful pretrial detention").

Stephens's remaining Strickland claims do not warrant habeas relief. Taking them in turn, Stephens's claims 3-6, 9, and 10 about Mr. Cohen not sharing discovery, failing to draft questions before trial, failing to object to unspecified misstatements, failing to investigate Julien, failing to

18

investigate Stephens's alibi, and failing to investigate alternate perpetrators all fail because they are unsupported by any evidence other than Stephens's own bald assertions and are in large measure contradicted by the record. (Sup. Ct. 440 at 12.) "Petitioner's bald assertion that counsel should have conducted a more thorough pre-trial investigation fails to overcome the presumption that counsel acted reasonably." Matura v. United States, 875 F. Supp. 235, 237 (S.D.N.Y. 1995); accord Yannai v. United States, 346 F. Supp. 3d 336, 348 (E.D.N.Y. 2018). In fact, Mr. Cohen's representation appears to have been based on sound trial strategy. Mr. Cohen's cross-examination was targeted at Julien's fluctuating testimony. He also repeatedly objected to Julien's identification because she claimed that the detective "told her before she made the identification that number five shot" Mercurius. (Tr. 212-20.) Stephens has not shown that any deeper investigation into Julien would have borne fruit to enhance Mr. Cohen's cross-examination of her.

As to Stephens's alibi, it is contradicted by Mr. Cohen's assertion that "neither defendant nor his grandmother and the several family members who were actively involved throughout the case ever mentioned defendant's having an alibi of being at his grandmother's house." (D.E. # 14 Ex. H PageID# 2020.) Mr. Cohen's choice not to investigate the alternate perpetrators was a sound strategy; he identified "Akeem" and "Angel" as potential perpetrators in closing statements to cast a reasonable doubt but did not expend valuable time tracking them down given the lack of concrete evidence linking them to the crime. (Sup. Ct. 440 at 13.)

Finally, Stephens's claim (8) that Mr. Cohen did not adequately cross-examine Julien about her retraction of a pre-trial letter identifying Stephens is without merit. Mr. Cohen explained that "he avoided questioning Julien about her denial of the contents of the written statement because cross-examination risked revealing that much of the written statement was consistent with and buttressed her trial testimony." (Id. 12.) Aside from statements consistent with Julien's testimony

at trial, the remaining content of the letter was damning to Stephens. In it, she writes that Stephens "told [her] he was going to shoot Shemel [Mercurius]" because "he wanted to have sex with her [and she] said no." (D.E. # 14 Ex. H PageID# 2056.) Mr. Cohen's choice to not cross-examine Julien on a letter that was consistent with her prior statements and would have been highly prejudicial to Stephens by showing a motive to shoot Mercurius was entirely reasonable. This is especially so because Mr. Cohen's chief trial strategy was convincing the jury that Stephens did not intend to kill Mercurius to avoid a murder conviction. (Sup. Ct. 440 at 12.)

In sum, the court's ruling that Stephens failed to show that Mr. Cohen's performance at trial fell below an objective standard of reasonableness was not the result of an unreasonable application of Strickland. In fact, that Stephens was acquitted of a murder charge shows that Mr. Cohen's trial performance was competent. See Karr v. Sevier, 29 F.4th 873, 883 (7th Cir. 2022) (the fact that "the jury acquitted Karr on Count 4 . . . supports the conclusion that [counsel's] performance did not fall below an objective standard of reasonableness"). Further, given the significant evidence the State presented against Stephens, he has not shown any prejudice from Mr. Cohen's representation.

## VIII.    Stephens's Pro Se Letters

After Stephens's instant petition was fully briefed, he filed a letter with this Court seeking an extension of time to supplement his reply brief in support of his petition, and for me to order his attorney or Respondent to provide him with the "'complete' case file," and to allow him a second stay-and-abeyance under Rhines to exhaust additional arguments in New York state courts. (D.E. # 17 ("1st Letter") 6.) The Clerk of Court initially rejected this letter because Stephens was represented by counsel. (Id. 2.) Three months later, his attorney moved to withdraw as counsel due to "irreconcilable conflicts," as evidenced by Stephens's letters. (D.E. # 19-1 ¶ 3; see also

20

D.E. # 18 ("2d Letter").)  Stephens followed up on December 25, 2024 and March 10, 2025 requesting to remove his attorney from this case and for a "second stay and abeyance predicated upon the ineffective representation of present counsels/firm."  (D.E. # 20 ("3d Letter") 1; D.E. # 21 ("4th Letter")[11].)  In his letters, Stephens argues, pro se, that a second stay is appropriate to:  (1) exhaust a new argument that the State did not prove causation on the manslaughter charge because the NYPD's delay in bringing Mercurius to the hospital caused her death; (2) exhaust additional Confrontation Clause arguments about the testimonial intent of Mercurius's statement; (3) exhaust a new claim that his conviction for possessing a "semi-automatic rifle" does not match his indictment for possessing a handgun; (4) exhaust an argument that the State did not prove the requisite mens rea for first degree manslaughter because the gunshot was aimed at Mercurius's "shoulder, and not a vital area"; (5) exhaust additional prosecutorial misconduct arguments about Julien's mental health records; and (6) further develop arguments in light of the conflict between him and his attorneys.  (1st Letter 4-6; 2d Letter 2 (focusing on Julien's mental health records); 3d Letter 2-3.)

Ordinarily, federal courts review only exhausted claims in habeas due to comity and federalism interests.  Rhines, 544 U.S. at 273.  Since Congress enacted a one-year statute of limitations in AEDPA, see 28 U.S.C. § 2244(d), courts entertaining habeas petitions initially containing exhausted and unexhausted claims have discretion to stay a petitioner's case to allow him to present the unexhausted claims to the state courts first.  Rhines, 544 U.S. at 276.  But "stay

---

[11] In this 4th Letter he also asks for me to recuse myself from this case because I have not acknowledged his letter requests nor issued an additional Rhines stay.  (4th Letter 1-2.)  I liberally interpret his request (e.g., McLeod v. Jewish Guild of the Blind, 864 F.3d 154, 156 (2d Cir. 2017)) as referring to a disqualification based on circumstances "in which [my] impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  District Courts need not address each request a litigant makes the moment it comes in; addressing motions in an ordinary timely manner does not constitute grounds for recusal.  Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC, 793 F.3d 313, 329 (3d Cir. 2015) ("We have never held that delay alone merits reassignment."); United States v. Lamorte, 940 F. Supp. 572, 577 (S.D.N.Y. 1996) (asserted delay in addressing criminal motion did not satisfy § 455(a)).  And as explained below, a further Rhines stay is not warranted.

and abeyance should be available only in limited circumstances . . . when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court" and where the "unexhausted claims are [not] plainly meritless." Id. at 277.

Stephens's new arguments about the NYPD causing Mercurius's death and the mismatch between the trial evidence and his indictment on the characterization of the gun are time-barred because they were not presented to the state courts and were filed more than a year after his conviction. And while Stephens has been "pursuing his rights diligently," no "extraordinary circumstances stood in his way" of raising these claims. Holland v. Florida, 560 U.S. 631, 649 (2010) (quotations omitted). Instead, Stephens chose to not raise either of these claims relating to evidence central to his trial on direct or collateral review. And, either way, they are plainly meritless. "With respect to an allegedly intervening cause of death, it is only where the death is solely attributable to the secondary agency, and not at all induced by the primary one, that its intervention constitutes a defense" to manslaughter. People v. Swift, 160 A.D.3d 1341, 1342 (4th Dep't 2018) (cleaned up). His claim about the mismatch of the indictment and the facts in evidence is also without merit. People v. Buanno, 296 A.D.2d 600, 601 (3d Dep't 2002) ("Proof that defendant possessed a loaded firearm, as alleged in . . . the indictment, is sufficient to sustain a conviction of the weapon possession counts of the indictment without the need for proof of the additional facts alleged in the indictment regarding the caliber and make of the firearm.").

His new arguments for the Confrontation Clause challenge and mens rea challenge are likewise without merit. First, as detailed above, Stephens has made those challenges on essentially the same grounds already, and they have failed. And second, to the extent they sound in new arguments, they would be procedurally defaulted under § 440 because they could have been raised at trial or direct appeal but were not. Aparicio v. Artuz, 269 F.3d 78, 91 (2d Cir. 2001). Likewise,

his request for additional detail about Julien's medical history is without merit. His trial counsel was aware of Julien's mental health and chose to tailor his cross-examination of her in a different way. (E.g., Tr. 78-79 (describing documents about Julien provided to Mr. Cohen before trial).) As discussed above, Mr. Cohen's choice was not unreasonable. Finally, a further Rhines stay is unwarranted because the arguments Stephens seeks to develop have been addressed at length in the briefs before me and in this Memorandum and Order. Because Stephens's pro se claims are clearly meritless, I will not grant a stay for him to assert them in state court.

## CONCLUSION

For the foregoing reasons, Stephens's motion is DENIED. Because he has failed to make a substantial showing of a constitutional right, no certificate of appealability shall issue. 28 U.S.C § 2253(c)(2). The Clerk of Court is directed to enter judgment accordingly, to mail Stephens a copy of this Memorandum and Order, and to close the case.

SO ORDERED.

Dated: June $\underline{10}$, 2025
Brooklyn, New York

/s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge

23